The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. Upon reconsideration of the evidence, the undersigned reach a different decision than that reached by the Deputy Commissioner and accordingly, the April 20, 1995 Opinion and Award of Deputy Commissioner Fuleihan is HEREBY REVERSED AND VACATED.
* * * * * * * * * *
The Pre-Trial Agreement entered into by the parties on 28 February 1994 is incorporated herein by reference. Additionally, at the initial hearing, the parties stipulated into evidence Industrial Commission Forms 19 and 33 contained in the Industrial Commission file, plaintiff's recorded statement to defendant carrier which was taken on 23 September 1991, and prehearing interrogatories dated 6 October 1992, including the 4 March 1994 supplement thereto.
* * * * * * * * * * *
Based upon the competent and convincing evidence adduced at the hearing and by deposition, the undersigned make the following
FINDINGS OF FACT
1. As of the date of initial hearing plaintiff was 40 years of age, left-hand dominant, and a high school graduate.
2. Plaintiff was employed with defendant, a manufacturer of glass bottles, from June of 1973 through 1975, from 1977 through 1978, and had currently been employed by defendant since 1984. Throughout her employment with defendant, plaintiff had held a series of different positions. From 1973 through 1975, and from 1977 through 1978, plaintiff was employed as a selector in defendant's Winston-Salem plant, which position required her to select bad bottles from good bottles as they came down the assembly line. From 1984 through 1988, plaintiff was employed as a selector line observer, during which period she was responsible for manually packing bottles in boxes, staying alert to line jams, making sure the cartons fed into the machines properly, and cleanup. In 1988, plaintiff was employed as a WSL attendant, during which period her responsibilities included relieving WSL operators for breaks, making wrap changes, and assisting the WSL operator to load bare ware onto the machines. From 1988 until the present time, plaintiff has been employed as a WSL operator, and her responsibilities in that capacity have included staying alert to line jams, checking the quality of wrap every 5 minutes, making wrap changes with a single downward motion of the hand, wrapping every bottle that comes off the system, changing ringer wrap every hour, cleaning when necessary. In order to check the quality of the wrap on the bottles, plaintiff would grasp one or two bottles, each weighing from 6.1 to 7.5 ounces, in each hand and turn the bottles with a rotating wrist motion in order to observe the labels. From 1988 through 1992, plaintiff would typically be required to load onto the WSL machine one to two loads of bare ware intermittently per each eight hour shift, with three to four loads being the maximum. Each load came to plaintiff either as bottles in cartons, or as a loose layer of bottles on stacked tier sheets. If the bottles were in cartons, each load was 12 tier sheets high, with 24 cartons on each tier sheet and 9 bottles in each carton, for a total of 2,592 bottles. If the bottles were loose, each load was 13 tier sheets high with 306 bottles on each tier sheet, for a total of 3,978 bottles. At the initial hearing, plaintiff demonstrated the technique by which she loaded bare ware by placing the fingers on one hand inside 4 bottles, lifting the bottles and turning her body as if the WSL machine faced her back. While actually working, plaintiff used the fingers on both hands to load 8 bottles at once. From 1988 through 1992, a significant portion of plaintiff's duties were repetitive in nature. Since 1992, plaintiff had not been required to load bare ware, as the WSL machine was removed at that time.
3. Plaintiff's prior medical history is significant for a broken left wrist sustained in 1965 or 1967; a hysterectomy in 1985; pain sustained in both hands in 1988 or 1989 as a result of slipping on some oil and using her hands to break the fall; and pain sustained in both hands in 1990 as a result of falling on a metal step and using her hands to break the fall. Plaintiff did not seek medical treatment for the latter two incidents, and she experienced no pain in her hands and wrists from 1990 until November of 1991.
4. In November of 1991, plaintiff began to experience pain, numbness and tingling in the left hand and wrist, especially while sleeping and upon waking, which she reported to Dr. Hunter Strader, defendant's company physician, on 17 November 1991. A phalen's test performed by Dr. Strader during the course of that visit was positive, leading him to suspect that plaintiff suffered from carpal tunnel syndrome, and to advise her to wear a splint on the left wrist.
5. Plaintiff continued to work for defendant until 12 March 1992, when she ceased working due to illness unrelated to the claim giving rise hereto. Upon returning to work on 4 May 1992, the pain in plaintiff's left wrist intensified.
6. Thereafter, in July and August of 1992, Dr. Strader treated plaintiff conservatively for continued pain in the left wrist and the onset of slight pain in the right wrist, for which he advised plaintiff to continue wearing the splint on the left wrist, to begin wearing a splint on the right wrist, restricted her from lifting more than 2 pounds and referred her to Dr. J.M. McWhorter for a neurological evaluation.
7. On 7 October 1992, plaintiff reported to Dr. McWhorter with complaints of bilateral hand numbness which caused her to wake several times a night. Upon examination, plaintiff exhibited positive tinel's signs bilaterally.
8. On 15 October 1992, plaintiff ceased working for defendant due to pain in both hands and wrists.
9. On 19 October 1992 and pursuant to Dr. McWhorter's instructions, plaintiff underwent nerve conduction studies of the median nerves in both upper extremities and the ulnar nerve in the left upper extremity. The results were normal.
10. In November of 1992, plaintiff began a conservative course of treatment for weakness and numbness of the hands by Dr. Paul Martin, a neurologist. Pursuant to Dr. Martin's recommendation, plaintiff underwent repeat nerve conduction studies on 8 July 1993 by Dr. William Brady, the results of which were also normal. Throughout plaintiff's treatment by Dr. Martin, she exhibited numbness of the fingertips and pain in the hands, wrists and up the arms to the neck which, coupled with the repetitive nature of plaintiff's work, led Dr. Martin to conclude that plaintiff suffered from bilateral carpal tunnel syndrome.
11. On 3 February 1993, plaintiff began undergoing treatment for neck pain and left and right arm pain extending down into the wrists by Dr. William Brown, a neurosurgeon to whom she was referred by Dr. Martin. Based upon plaintiff's complaint of tingling in the hands which was aggravated by use, increased symptomology at night, the fact that plaintiff' s symptoms improved somewhat with the use of wrist splints, and the repetitive nature of plaintiff's job duties, Dr. Brown diagnosed plaintiff with bilateral carpal tunnel syndrome.
12. From 20 April 1993 through 12 May 1993, plaintiff returned to work for defendant. During this period, plaintiff's symptoms of bilateral hand and arm pain, numbness and tingling, which had improved significantly, began to worsen. On 13 May 1993, Dr. Robert Sypher of Greensboro Hand Surgery Associates restricted plaintiff from repetitive lifting. As defendant could provide plaintiff with no job within her restrictions, she ceased working at that time.
13. On 27 May 1993, Dr. Sypher released plaintiff to return to work without restrictions on 1 June 1993. Plaintiff returned to work for defendant on 2 June 1993 and stopped working due to continued symptomology of hand and wrist pain.
14. On 27 July 1993, plaintiff underwent treatment for bilateral wrist pain, bilateral elbow pain and pain in both hands by Dr. John E. Ritchie, an orthopedic surgeon to whom she was referred by Dr. Martin, and who injected plaintiff in the left carpal tunnel. On 19 August 1993, plaintiff exhibited significant improvement of her left hand and wrist pain subsequent to receiving the injection, which led Dr. Ritchie to conclude that plaintiff had carpal tunnel syndrome and to recommend that she undergo a left carpal tunnel release.
15. Plaintiff was examined by Dr. Ritchie's associate, Dr. Gregg Cregan, on 27 October 1993, at which time plaintiff exhibited positive tinel's and phalen's flexion signs. Dr. Cregan recommended that plaintiff undergo a carpal tunnel release, for which he referred her back to Dr. Brown.
16. Plaintiff has also received conservative treatment for bilateral hand and arm pain from Dr. Isabel Bittinger and Dr. David Gower, and at the Rehability Center in Winston-Salem. While it appears that plaintiff was provided with medical care by parties in addition to those mentioned herein, the medical records from those providers have not been entered into evidence, and, consequently, the undersigned cannot ascertain the nature of medical treatment rendered.
17. Plaintiff has bilateral carpal tunnel syndrome.
18. On 14 January 1994 and 9 March 1994, plaintiff underwent left and right carpal tunnel releases, respectively, by Dr. Brown. Subsequent to the surgeries of January and March of 1994, plaintiff obtained significant relief of her symptomology associated with bilateral carpal tunnel syndrome.
19. While plaintiff does suffer from bilateral carpal tunnel syndrome, which was most likely significantly contributed to or at the very least aggravated by her employment, there is insufficient convincing evidence of record, especially in the way of expert testimony, to prove that plaintiff was placed at an increased risk of developing bilateral carpal tunnel syndrome as compared to members of the general public not so exposed.
* * * * * * * * * * *
Based upon the findings of fact as found by the Deputy Commissioner and adopted by the Full Commission, the Full Commission find as follows:
CONCLUSIONS OF LAW
1. While plaintiff does suffer from bilateral carpal tunnel syndrome which was most likely significantly contributed to or at the least aggravated by her employment, there is insufficient convincing evidence to show that plaintiff was placed at an increased risk from her employment to develop bilateral carpal tunnel syndrome as compared to members of the general public. N.C. Gen Stat. 97-53(13); Booker v. DukeMedical Center, 297 N.C. 458 (1979). While there is much evidence in the way of repetitive motion, that, in and of itself, does not meet the increased risk element, as many activities of everyday life may be also be repetitive in nature and as Dr. Brown did not single these work activities out as placing plaintiff at an increased risk.
2. As a key element required by G.S. 97-53(13) has not been sufficiently proven, plaintiff has not contracted a compensable occupational disease under the Workers' Compensation Act and is accordingly entitled to no benefits. Id.
* * * * * * * * * * *
The foregoing findings of fact and conclusions of law engender the following
ORDER
1. Plaintiff's claim for benefits must be, and the same is, HEREBY DENIED.
2. Defendants shall pay an expert witness fee in the amount of $240.00 for Dr. Brown. Otherwise, each side shall bear its own costs.
This case is ORDERED REMOVED from the Full Commission hearing docket.
This the __________ day of ________________________, 1996.
 S/ ______________________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ ______________________________ DIANNE C. SELLERS COMMISSIONER
S/ ______________________________ THOMAS J. BOLCH COMMISSIONER
JHB/nwm 07/08/96